UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TREVIS LOVE,                          )
                Petitioner,           )
                                      )
v.                                    )         NO. 2:03-CR-62
                                      )         NO: 2:09-CV-18
UNITED STATES OF AMERICA,             )         Judge Greer
                Respondent.           )

## MEMORANDUM OPINIONAND ORDER

This matter is before the Court on the motion of the petitioner, Trevis Love("Petitioner" or

"Love"), pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct sentence, [Doc.816]. An order

was previously entered on February 9, 2012, denying all claims raised in petitioner's motion except

for three claims of ineffective assistance of counsel for failure to seek to sever petitioner's case and

that of co-defendant Delman Davis, failure to interview and present certain witness testimony, and

failure to seek and present testimony of a handwriting analyst, [Doc. 888]. With respect to those

three claims, an evidentiary hearing was conducted on March 9, 2012. For the reasons which

follow, the Court has determined that the petitioner's remaining claims pursuant to § 2255 lack merit

and his petition, as to those claims, will likewise be DENIED.

The procedural and factual background of this case, as well as the applicable standard of

review, were set forth in the Court's prior order and will not be repeated in this order.

## Analysis and Discussion

As set forth above, Love raises three specific allegations of ineffective assistance of

counsel. The Court will discuss each in turn.

**A.      Severance and Testimony of Delman Davis**

As noted in the Court's prior order, Eric Serna and Delman Davis were indicted by the federal grand jury on August 26, 2003, [Doc. 13].  Love was added as a defendant, along with five others, including George Duarte, on October 28, 2003, when the grand jury returned a superseding indictment, [Doc. 64].

On May 3, 2004, the Magistrate Judge entered a pretrial order setting the trial of all defendants for June 22, 2004, [Doc. 293].  On May 28, 2004, the Court, on its own motion, entered a motion severing the trial of the defendants into two groups: (1) Jose Duarte, Gary Musick and Lita Musick were scheduled for trial on June 22, 2004, and (2) Delman Davis, Trevis Love and Craig Stewart were scheduled for trial on July 20, 2004, [Doc. 307].[1]  On June 30, 2004, the Court continued the trial of Davis, Love and Stewart to August 31, 2004.  On August 10, 2004, the government moved for consolidation for trial of the Musick defendants [2] with that of Davis, Love and Stewart and for a continuance, [Doc. 395].[3]  In response, counsel for Love stated that "Defendant Love . . . does not have an objection to the continuance or to the consolidation of Defendants at trial." [Doc. 399].  Ultimately the Court denied the government's motion, [Doc. 420], and the trials remained separated.[4]

Love contends in his motion that he "requested that counsel file a motion to sever his own

---

[1]  Other of the defendants had entered into plea agreements by this time.  The defendants in the first grouping, those scheduled for trial on June 22, 2004, were charged with both marijuana and cocaine related offenses while those in the second grouping, scheduled for trial on July 20, 2004, were charged in a cocaine conspiracy.

[2]  Jose Duarte had now entered a guilty plea.

[3]  The Musick trial had also been continued.

[4]  Defendant Stewart later entered a plea of guilty.  The Musicks were tried together and Davis and Love were tried together.

trial from Davis',"because Davis was "the one individual who was present with him during his various meetings with Duarte." [Doc. 822 at 36]. Love claims that he told counsel "that Delman Davis would be willing to testify in his defense, as long as he would not be required to take the stand in his own trial." Love supports his motion with the affidavit [5] of Davis in which he states that if "Love had been tried separately, I would have been willing to take the stand in Love's defense." The government responds that Love cannot show that his attorneys were deficient because Love was not entitled to a severance and, even if deficient performance could be established, Love cannot establish prejudice.

Davis was called as a witness by petitioner at the evidentiary hearing on March 9, 2012. Davis, who has known Love since 1995, testified that he would have corroborated much of Love's account about Duarte's interest in investing in Love's concert promotion business, that he had attended two meetings at Kentucky Fried Chicken ("KFC") in Johnson City where Duarte, Love and others had discussed an upcoming concert and Duarte's possible investment and could have confirmed some of the details of Love's version of the events surrounding the purchase by Duarte of a Lincoln Navigator.

Davis also testified that he had informed Love, prior to trial, that he "would do whatever he was asked," and that he told his attorney several times that he didn't want a joint trial and that he was willing to testify for Love. According to Davis, his attorney never communicated that willingness to Love's attorneys. Davis also confirmed that he stated to his attorney a desire to testify at the joint trial and also made his willingness known to Love's attorneys during the trial. Davis

---

[5] The "affidavit" is, in reality, nothing more than a hearsay statement, signed by Davis but not notarized.

did not claim at the hearing that he would have testified only at a separate trial. At the evidentiary hearing, Davis refused to answer some questions about his cocaine trafficking activities even though he maintained his innocence of the conspiracy charged in the present indictment.

Love was represented in this case by two retained, well experienced and capable criminal defense attorneys, Stacey Street and Robert Jessee, both of whom appear frequently in this Court. Both testified at the evidentiary hearing. Street has practiced law for 20 years and Jessee for almost 36 years. Both have extensive experience in defending criminal cases in both state and federal courts.

Street acknowledged that he and Jessee had numerous conversations with Davis' attorney but never actually interviewed Davis. After Davis' case had been rested at trial, Davis' attorney informed Street and Jessee they could call Davis but they likely would not have done so, even at a separate trial, because of the strong evidence against Davis of involvement in the cocaine conspiracy. Street felt the benefit that would have flowed from the few things that Davis could have testified to that would have supported Love was far outweighed by the risk of calling him as a witness.

Jessee testified that he had no recollection of discussions of a possible severance with Love. Jessee also stated that he would have discussed the response to the government's motion to consolidate with Love and had no recollection of Love having expressed any concern about the consolidation. He acknowledged that Love wanted him to interview Davis but Davis' lawyer would not allow the interview. The first time Jessee heard that Davis was willing to testify was after Davis rested his case and Davis' lawyer said he wanted to do so. Jessee said that he and Street did not really want Davis as a witness, and Davis' testimony at the March 9 evidentiary hearing confirmed

4

the reasons why. [6]

As a preliminary matter, to the extent the Court must make credibility determinations between Street and Jessee on the one hand, and Love on the other, the Court fully credits the testimony of Street and Jessee. Both have practiced in this Court, their experience and professionalism is apparent, and they are fully believed by the Court.

With respect to the severance issue, both petitioner and the government point to *United States v. Ross*, 339 F.3d 483 (6th Cir. 2003) as significant on the question raised here. The case does set out the correct test in the Sixth Circuit that a defendant seeking the testimony of a co-defendant must meet to obtain a severance. To warrant a severance, a defendant "must demonstrate: (1) a *bona fide* need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect, and (4) that the co-defendant will testify if the cases are severed. *Id*. at 493. As petitioner points out, the Sixth Circuit in *Ross* affirmed the dismissal of Ross' § 2255 motion largely on the basis that Ross had not shown that his co-defendant would have testified even if the cases had been severed. Here, Davis has indicated a willingness to testify, not just if the case was severed, but even if it was not. In view of Davis' testimony, it thus appears that the correct inquiry is not whether Love's attorneys were deficient for not seeking a severance but rather whether it was deficient performance not to call Davis as a witness at trial.

Nevertheless, Love has not carried his burden of showing that he could have met the Sixth Circuit's "stringent test" for obtaining a severance. *Id.* Love can neither show a *bona fide* need for the testimony nor its exculpatory nature. Even with Love's attempt to limit Davis' testimony to

---

[6] Although the rule of sequestration of witnesses had been invoked at the March 9 hearing, the parties had agreed that Jessee could remain in the courtroom and hear the testimony of the witnesses.

various specific subjects, Love can also not show overall that Davis' testimony would have been helpful to him. Although Davis could have corroborated certain parts of Love's own testimony, other parts of Davis' testimony would not have been helpful to Love. Additionally, other witnesses were available to verify those limited details who did not carry the same "baggage" and potential risk that Davis did. In short, there were others who could have testified on the specific subjects where Davis was potentially helpful; the testimony, therefore, was cumulative of theirs and of Love's; the testimony was not exculpatory but only had impeaching value; and the value of the testimony was likely overall more harmful to Love than helpful. And, although Davis says otherwise, it is unlikely he would actually have been willing to testify, especially on cross examination, about his own activities given his reluctance to do so at the March 9 evidentiary hearing.

Most importantly, however, Love cannot show prejudice and there is no reasonable probability that the testimony would have altered the jury's verdict. Simply put, Delman Davis is not, and was not at the time of trial, a credible witness. Davis had been convicted of felony drug offenses twice prior to this trial and he would have been subjected to vigorous cross examination about those convictions, seriously undermining his credibility. His whole demeanor during the evidentiary hearing, his evasive answers, and his reluctance to answer questions about his drug trafficking activities all made him less than a credible witness at the March 9 hearing. Given the nature of his proposed testimony that he had never known Trevis Love to possess, use or distribute drugs, he would have been subjected to cross examination about Love's prior drug convictions, calling further attention to them. Davis' testimony about Love's meeting with himself, Duarte, Serna and Garrick Butler would have highlighted Love's association with drug dealers. His

6

testimony would have further emphasized that dealings between Duarte and Serna involved large sums of cash, not generally the currency of legitimate businessmen.

Finally, Davis' testimony would have been quite harmful to Love in one specific aspect. Beside the name "Travis" in one of Duarte's drug ledgers was the phone number 423-677-7706. Duarte testified that "Travis" was Trevis Love and that he reached him at the referenced telephone number. Love acknowledged that the number was his business cell phone number but that he used a different cell phone for personal uses, a number he had not given to Duarte or Serna. Love suggested that Duarte may have gotten the number off his business cards or the concert proposal Love had given to him. Davis was asked at the March 9 hearing to identify the number where he contacted Love by phone and he immediately identified the number as 677-7706. He also said that Duarte and Love had exchanged contact information and phone numbers in his presence after thier initial discussion about the possibility that Duarte might invest in Love's concert promotion business. According to Davis, the number provided by Love was 677-7706, undercutting seriously Love's offered explanation for the number listed in the drug ledger and providing a direct link between Love, Duarte and the phone number.

On this issue, petitioner has failed to prove either that counsels' representation was deficient or that he suffered prejudice from counsels' actions. The petition therefore lacks merit on this issue and will be denied as to this claim.

### B. Expert Handwriting Analyst

During the search of Eric Serna's house subsequent to his arrest, several spiral notebooks were recovered from a safe in a closet. These notebooks contained numerous names, telephone numbers and various numbers, many of which had been marked through with an "X." Duarte and

7

Serna identified these as Duarte's drug ledgers where he kept track of the amounts he was owed by various customers. The name "Travis" appeared throughout these drug ledgers. Petitioner was identified by Duarte and Serna as "Travis" and the numbers beside the name, almost always multiples of 24,000, as representing kilogram quantities of cocaine (e.g. 72,000 equaled to 3 kilos times 24,000). As noted above, petitioner's cell phone number appeared beside one of the entries.

Love claims in his motion that he "instructed his attorney to procure the services of an expert hand-writing analyst," because absent proof of the author of the drug ledger entries "there would be no nexus between the ledger . . . and the petitioner." [Doc. 822 at 48]. He further claims that "the government also depended on the similarity between Love's handwriting and the entries on the transfer of ownership of the Navigator," and that "an expert . . . would have been able to discredit Duarte's claim that he made every entry into the ledger . . ." The significance of these matters completely escapes the Court. First of all, how proof of the author of the drug ledger entries even relates to the nexus between the "Travis" entries and petitioner is not explained. The nexus between the references to "Travis" and the petitioner was provided by Duarte and Serna's testimony, and the authorship of the entries was largely irrelevant on that issue. Secondly, the government never contended, so far as the Court can tell, that Love made any of the entries in the ledgers nor did the government compare Love's handwriting to the Navigator documents. In fact, the government offered proof that the entries were made by Duarte or Serna, and never, again so far as the Court can tell, argued that all of the ledger entries were made by Duarte. Duarte himself testified that both he and Serna made entries into the ledgers, [Doc. 609, Tr. at 31], and that he might have told his brothers to write them "if [he] was doing something else." [*Id*. at 42]. Love's testimony on this issue at the evidentiary hearing on March 9 was no clearer.

Street and Jessee were also questioned on March 9 about Love's claim that he requested an expert handwriting analyst. Street acknowledged that Love had talked about hiring an expert but testified that he saw no need for one since they knew that the ledgers were not in Love's handwriting. Jessee testified that he had no recollection of Love's request but had one been made he would immediately sent the request to a handwriting expert at East Tennessee State University.

Love cites the case of *United States v. Tarricone*, 966 F.2d 1414 (2d Cir. 1993) in support of this claim. In *Tarricone*, the Second Circuit found prejudice from defense counsel's failure to pursue exculpatory handwriting evidence to contradict government witnesses' testimony that defendant's handwriting was on a relevant document. *Id.* at 1419. Yet that is not the situation here. Petitioner does not claim that the purpose of the handwriting analyst was to rebut testimony from the government that his handwriting appeared in the ledgers or some other important document in the case. He claims that its purpose was to show that Duarte did not make all the entries, something that is uncontested. Even if that were his claim, it would fail for the simple reason that the report submitted by the expert witness does not address that question. Furthermore, the testimony at trial was that the transfer documents were partially filled out when received from Love, not that Love had filled them out.

This claim is a non-starter. Petitioner can show neither deficient performance nor prejudice. The Forensic Handwriting Report submitted by Marty Pearce, CDE, CJA, compares various of the "Travis" entries from the ledger to each other to determine if they were authored by the same individual. Her report, [*see* Doc. 1-2, No. 2:09-CV-18], in sum, concluded that they were not. The report, therefore, addresses a matter not an issue in the trial. Given the uncontested testimony of Duarte and Serna set forth above that more than one person made the entries, it was not deficient

performance on the part of counsel not to seek the analyst nor can it even arguably be said that there is a reasonable possibility that it would have altered the jury's verdict.

## C. Failure to Contact Witnesses or Present Witness Testimony

Finally, petitioner makes a claim that counsel provided ineffective assistance of counsel for failure to contact potential witnesses and present their testimony to support of his defense that his dealings with George Duarte and Eric Serna related not to dealing in illegal substances, but to Duarte's perfectly legal investment in Love's concert promotion company and his purchase of two vehicles, as well as the sale of two vehicles to Serna. Love testified [7] that he started a promotion company, Reeltime Promotions, LLC, in late 2001. In June, 2002, while having his vehicle detailed at Delman Davis' detail shop, Love met Duarte, who was also having his vehicle detailed. During their conversation, Love mentioned to Duarte that he was the owner of a promotion company planning a large concert to take place in September, 2002 in Knoxville, Tennessee, and was seeking investors. Love and Duarte exchanged contact information.

Two weeks later, in late June, Love met Duarte at KFC in Johnson City to discuss the possibility that Duarte might invest. Also present were Eric Harris, Garrick Butler and Delman Davis. A few days later, they met again at the same restaurant with Harris and Davis present.[8] Duarte agreed to invest $55,000 but did not have immediate access to the money.[9] A few days later,

---

[7]  This statement of Love's testimony comes either from his oral testimony on March 9 or his affidavit, which although not notarized, was adopted by him in his March 9 testimony.

[8]  Love's trial testimony was that Duarte called three days after the first KFC meeting with questions and that this meeting occurred around a week after the call, [Doc. 610, Tr. at 33].

[9]  Love's trial testimony was that Duarte called the next day and said he could invest, [*Id*. at 34].

Duarte made an initial investment of $15,000.[10] The money was exchanged at the home of Jayvon Bowens. Several of Love's friends and associates witnessed him with the money and his girlfriend, Susan Jordan, witnessed him counting the money.[11] The final two installments of $15,000 were also delivered by Duarte to Love at Bowen's house. When the last $15,000 was delivered, Love and Duarte were the only ones present.[12]

In July, 2002, Love again met Duarte at Davis' detail shop. Duarte sought a guarantee that, at a minimum, he would have his money returned, even if the concert failed. Unwilling to make that guarantee, Love made arrangements to return Duarte's money. Love met Duarte on a Saturday morning in mid-July at the home of Bowens where he returned the $45,000 which had been kept in a lockbox since its receipt.[13] Harris and Bowens were present. After the money was returned to Duarte, Love convinced his cousin, Leonard Little, a professional football player, to invest $100,000. The investment of Little was finalized after a meeting with Little's financial advisor in Knoxville in late July. The Knoxville concert occurred on September 14, 2002 at Thompson Bowling Arena on the University of Tennessee campus. Gross receipts totaled $117,834.00. Tax records confirming the amount were introduced at trial.

In August, 2002, Love began parking his Lincoln Navigator at Davis' detail shop with a "for sale" sign in the window. In October, Duarte agreed to purchase the Navigator for $25,500. On

---

[10] Love's trial testimony was that this occurred on the following day, [*Id*.].

[11] Jordan could not confirm this.

[12] Bowens testified at trial that Love could not get into his house except when he [Bowens] was there, [Doc. 611, Tr. at 7].

[13] Love's trial testimony was that this occurred in mid-August, 2002, and his trial testimony did not mention anyone else being present, [*Id*. at 37].

11

October 3, 2002, Duarte delivered $25,000 in cash to Love at Bowens' house. The money was counted in the livingroom of Bowens' house in the presence of several of Love's friends. Love discovered that the cash was $500 short; he called Duarte and Duarte returned with the remaining money. On October 3, Love and Antwane Davis drove to AmSouth Bank and purchased a cashier's check for the amount of the payoff at Ford Motor Credit ("FMC") on the Navigator. He listed his mother, Madie Love, as the payer. The check was overnighted to FMC and the receipt portion of the check was mailed to his mother. When the title arrived, Duarte was allowed to take possession of the Navigator and given an unsigned title.

On October 4, 2002, Love, his mother and Antwane Davis drove to a Cadillac dealership in Atlanta and purchased a 2002 Cadillac Escalade. Love paid $11,000 in cash and financed the balance. Love used the remainder of the funds from Duarte and his personal funds to make the cash payment. In early 2003, Duarte offered to purchase the Escalade from Love; Love declined but agreed to arrange the purchase of a similar Escalade from his cousin Little for $35,000. In early March, Duarte delivered the $35,000 in cash, which had been placed in a cereal box, to Love at Bowens' house. Bowens, Quinlan Fitts ("Fitts") and Antwane Davis were present. He and Davis drove to Harriman to pick up the vehicle. Little had placed the wrong title in the Escalade and it was parked at Bowens' house until Little delivered the title.

In June, 2003, Serna approached Love about purchasing two Honda Accords he was having detailed at Davis' detail shop. On July 4, 2003, Serna delivered the purchase price of $4,500 to Love at his home at 1208 Welbourne Street. Jordan saw the funds and witnessed the meeting.[14]

---

[14] Jordan's affidavit, which was the only affidavit properly notarized, states that she did not witness the transaction but was present when two Mexican males came by and Love told her they were there to buy the Hondas. She later saw Love with an unknown amount of cash.

Serna left

with one of the Hondas and Serna came back "a few days later" to get the second.[15]  Love gave

Serna one of the titles on July 4 but had to obtain a title for the other vehicle.  After it was obtained,

Love contacted Serna on August 21, 2003, and requested a meeting at the Johnson City Mall to

deliver the title.  During their conversation, Serna asked Love if he could assist him in locating

Jeremiah Lovelady ("Lovelady")  regarding a vehicle Serna had purchased from him with a salvage

title.  Love  agreed to contact Delman Davis who he thought might be able to locate Lovelady.

Harris was present and overheard the conversation.  Davis was contacted and agreed and both he

and Serna then arrived at the food court at the mall.  Harris then drove Love to Love's home and

Serna followed in his vehicle.  Love retrieved the title to the Honda and delivered it to Serna.

Love stated in the affidavit that he never bought, sold or traded illegal substances with Serna,

Duarte or their representatives.  He further stated that no one outside his immediate family referred

to him by his first name "Trevis" and that he had never been referred to as "Travis."[16]

Love claims that he provided a list of witnesses to counsel during preparation for the trial.

On the list were 11 names: (1) Eric Harris, (2) Jayvon Bowens, (3) Antwane Davis, (4) Quinlan

Fitts, (5) Marquise Townsend, (6) Christy Lee, (7) LaTora Henderson, (8) Susan Jordan, (9) Elvin

---

[15]    The affidavit prepared by Love for Jordan stated that she witnessed Serna return for the automobile "the following day."  In her modifications to the affidavit, she disagreed with that statement.

[16]    Jordan disputed this and testified that "Travis" was the only way she had ever referred to Love throughout their ten year relationship.  Love's credibility and that of his witnesses on this issue was further undermined when Love filed his motion to supplement his § 2255 motion on October 11, 2011 [Doc. 877].  Attached to that motion are copies of the three prior state court judgments concerning Love's prior state convictions for selling more than one-half gram of cocaine, possession of more than one-half gram of cocaine with intent to sell and possession of marijuana.  Each of the judgments lists the style of the case as State of Tennessee vs. Travis Love.  In addition Love also attached to that motion his Certificate of Probation from the Tennessee Department of Correction.  It too refers to petitioner as "Travis."

Browne, (10) Madie C. Love, and (11) Garrick Butler. Petitioner contends that these witnesses had knowledge of (1) Duarte's investment in the Knoxville concert (Bowens, Harris, Jordan, Townsend, Browne and Madie Love); (2) Bowens, Davis and Fitts were present when Duarte delivered the first installment of his "investment;" (3) Jordan was present when Love brought the money home and stored it for safekeeping; (4) some were present when Duarte demanded a guarantee of a full return of his investment; (5) the sale of the Navigator to Duarte, not for cocaine, but for cash, including that the amount of cash delivered was less than that agreed upon; (6) details of the Cadillac Escalade sale; and (7) the exchange of money for the Escalade sale. Love complains that counsel did not interview any of the potential witnesses except Bowens and Browne, who testified at trial. None of the other witnesses, although available at trial, were called to testify by counsel according to Love.

Along with his petition, Love submitted "affidavits" prepared by him and signed by each of the individuals. Only one of the documents was notarized–that of Susan Jordan. Love acknowledges drafting each of the affidavits and each contained some identical language on several subjects. First, each of the affidavits contain the statement: "I have never known Trevis Love to possess, use, or sell cocaine in any form." Such character evidence is inadmissible and irrelevant but, even if admissible, would have subjected each witness to cross examination about Love's prior convictions and specific details of the case, thus emphasizing the prior convictions. Counsel cannot be faulted for not offering this kind of evidence.

Secondly, many of the affidavits contained statements about Duarte's dealings with Love which are not based on their personal knowledge but rather on what Love himself told them. Such testimony would have been inadmissible hearsay and/or because of lack of personal knowledge on

14

the part of the witness. Counsel cannot be found deficient for not offering inadmissible testimony.

Finally, each of the proposed witnesses verified that they "have never known anyone to use the name Travis in reference to Love at anytime whatsoever." As noted in footnote 16 above, these statements were not credible. Susan Jordan, with whom Love had a ten year relationship, testified at the March 9 hearing that she never called Love by any other name than "Travis." Likewise, the documents related to Love's 1994 convictions all have the name "Travis." And, at the March 9 hearing, Eric Harris inadvertently referred to Love as "Travis" from the witness stand. Once again, counsel cannot be found deficient for failing to offer evidence which would have been more harmful than helpful to the petitioner.

Likewise, both Jessee and Street testified that they had made a strategic decision that they would not call as a witness anyone who had a prior drug conviction, preferring not to emphasize Love's association with convicted drug dealers. This was an entirely reasonable strategy for counsel to follow under the circumstances of this case and is reason enough for the failure to call Delman Davis, Marquise Townsend and Garrick Butler, all of whom have been convicted of felony drug offenses in this Court.[17]

With that background, the Court will summarize the testimony of the witnesses who testified at the March 9 hearing: (1) <u>Eric Harris</u>, a close friend and associate of Love. Harris testified that he first met Duarte at a meeting in the summer of 2002 at KFC in Johnson City with Love, Delman Davis and Garrick Butler. Duarte expressed interest in investing in the concert promotion business but made no commitment. He also attended a second meeting with the same group, except for Butler, which Eric Serna also attended. Duarte said he wanted to be a part of the concert promotion

---

[17] Street and Jessee also testified that Eric Harris told them he had a misdemeanor drug conviction.

and invest $55,000.[18]  Cocaine was not mentioned at either of these meetings.  Harris was present

when Duarte gave Love the money.  Duarte delivered $45,000 in cash in one lump sum, bundled in

rubber bands.[19]  Harris testified that the money was returned to Duarte at Jayvon Bowens' residence

and that Love put the money in a cereal box and delivered it to Duarte.[20]  Harris witnessed Love

hand the money to Duarte.  Harris claimed to have overheard the conversation between Love and

Duarte from the porch and heard Love explain why the money was being returned.

Harris confirmed that Love wanted to sell a Navigator he owned and that Duarte was

interested in purchasing the vehicle.  In October, 2002, Duarte came to Bowens' house and drove

away in the Navigator.  He saw Love counting money in the house and heard Love call Duarte and

say he was $500 short.  He did not see a kilogram of cocaine on that date.  Christy Lee and several

others were present.

According to Harris' affidavit, Duarte was also trying to buy Love's Cadillac Escalade.

Love didn't want to sell but agreed to contact his cousin Little who had one for sale and check on

the price.  Duarte agreed to purchase the Little Escalade for $35,000.[21]  He was present when Duarte

picked the vehicle up at Bowens' house.

Harris also testified that Eric Serna purchased two Honda Accords from Love.  He saw cash

---

[18]  Harris' affidavit says Love sought $55,000 but Duarte said he could only come up with $45,000.

[19]   This testimony contradicted Love's trial testimony that Duarte delivered the money in three $15,000 installments.  Other witnesses also stated the money came in three installments.

[20]  Harris is the only witness who made reference to the $45,000 returned to Duarte being in a cereal box.

[21]  On March 9, Harris testified that the price was $30,000.

16

exchanged for the sale on July 4 [22] and later met with Love and Serna at the Johnson City Mall food court to give Serna the title.[23]   Serna asked if Love knew Jeremiah Lovelady and Delman Davis was called.  Harris testified that he never saw Eric Serna deliver cocaine to Trevis Love.  Harris said he was interviewed twice by Street and Jessee, subpoenaed for trial, and has a clear recollection of the events he testified to.

(2)     <u>Jayvon Bowens</u>, good friend and business associate of Love.  Bowens was associated with Love and Harris in ReelTime Productions and lived at 513 Hart Avenue in Johnson City with Fitts and Antwane Davis.  His house was a "social center" and Love visited often.  At some point, he learned that Duarte had invested in the concert promotion business.  Duarte came to his house and was "excited" to be involved and Love was giving him details about the upcoming concert. Duarte gave Love $15,000.  There were three or four other times that Duarte came by and he observed Love counting cash each time after Duarte left.[24]  Bowens is not sure who was present when the first installment was made.  He saw Love return $45,000 to Duarte after Leonard Little agreed to invest.  Fitts and Antwane Davis were also present.

Bowens also testified to being at home when Love met with Duarte about the sale of the

---

[22]  This appears to contradict the affidavit which says that Love showed him "the $4,500 that Serna had recently paid."

[23]  This, of course, contradicts Love's testimony that he and Harris went to Love's house, followed by Serna, to obtain the title, as well as the statement in the affidavit prepared by Love and signed by Harris.

[24]  Bowens' testimony lacked the significant detail found in the affidavit drafted by Love for Bowens to sign.

Navigator.[25]  He did not see an exchange of cash but saw Love counting cash [26] and heard him say

he was $500 short.  Bowens did not testify on March 9 about who was present at the time but his

affidavit says Antwane Davis, Fitts, Christy Lee and LaTora Henderson were present.  Bowens

testified that he went with Love to get a cashier's check for the Navigator payoff. [27]

Bowens also testified about the March 2003 sale of Leonard Little's Cadillac Escalade and

his presence during the transaction.  According to Bowens, Duarte arrived with another person and

they were examining the vehicle.  Love came into the house with a cereal box filled with money.

Durate took possession of the Escalade later.  During his testimony on March 9, Bowens did not

mention that anyone else was present at the time.  In his affidavit, however, he states that Antwane

Davis and Fitts were present.

(3)    Susan Jordan, former girlfriend and live-in companion of Trevis Love.  Love and

Jordan had a boyfriend/girlfriend relationship from 1994 until 2004-05.  Jordan received an affidavit

in the mail from Love which he asked her to read, review and sign.  She made significant changes,

signed a corrected version before a notary public on January 9, 2009, and mailed it back to Love.

Essentially, Jordan was unable to verify most of the significant events set out in the affidavit.

Significantly, though, she did testify that Love often had sums of cash and that she always called

him "Travis" throughout their relationship.  Jordan said there were no calls to her house from people

---

[25]    This was apparently the third time Bowens had seen Duarte.  He testified at trial that he met
Duarte only one time when he "bought Trevis' truck; that's about it." [Doc. 610 at 7].  He explained this
testimony on cross examination at the March 9 hearing testifying that he only had conversation with Duarte
one time.

[26]    This testimony conflicts with the affidavit prepared by Love and signed by Bowens which says
Bowens saw "the money on my kitchen table after Love counted it."

[27]    Love testified that he was accompanied by Antwane Davis and Davis testified likewise.  The
Bowens affidavit says that Love showed him the receipt,  not that he went with him to get the cashier's check.

18

trying to buy cocaine. She said Love also maintained a separate house.

(4)  <u>Madie C. Love</u>, petitoner's mother. Ms. Love testified that she had signed the affidavit sent to her by her son even though it was "not totally accurate." Ms. Love testified that the Navigator automobile was titled in her name because of her credit history. She gave her son permission to sell it because he wanted a Cadillac Escalade. He told her it was sold and she got a receipt from FMC showing that it had been paid off. Ms. Love went to Atlanta with her son and Antwane Davis to purchase the Escalade. A cash down payment was made. Ms. Love did not sign the Navigator title and did not know Eric or Raven Serna. She did not give anyone authority to sign her name to the title. As the Court understands her testimony, she never got the title to the Navigator.[28]

(5)  <u>Elvin Browne</u>, friend and business associate of Love. Browne gave limited testimony at trial. At trial, Browne identified a picture of his car, testified that he had it detailed at Delman Davis' detail shop and related a phone call he got from Agent Templeton. The call from Templeton, which he initially thought was a joke, was about an offer to him to plea bargain and tell what he knew. Browne told Templeton he didn't know what he was talking about.

At the March 9 hearing, Browne testified that he met Duarte at the detail shop and that he heard that he wanted to invest in the concert promotion company and later learned that Leonard Little had invested. He was not present when the Navigator or Escalade was sold nor was he present at KFC meetings. Browne is originally from St. Thomas, was an admissions counselor at ETSU and is currently director of undergraduate recruitment at King College. He was told by Jessee and Street

---

[28] This, of course, contradicts the testimony of Trevis Love that he received the title from his mother in the same envelope it had been received in and, without opening the envelope, gave the title to Duarte.

that he would testify as a character witness.

(6)　<u>Antwane Davis</u>, friend of Love and roommate of Jayvon Bowens.　Davis testified that he had known Love since 1997-98 and Love was "like a big brother."　He roomed with Bowens and Fitts.　He was involved in the concert promotions and a "board member" of ReelTime Productions.　He also worked at Delman Davis' detail shop.　Davis met Duarte when he brought a truck for detailing but never talked to him about investing in the promotion company.

Although the testimony was somewhat vague, Davis testified that he was present when Duarte delivered money to Love at 513 Hart Avenue.　Love and Duarte met outside, Love counted the money, Duarte left and Love came into the house with the money.

Davis was also present at 513 Hart Avenue when Duarte came after Love had said he had sold the Navigator to Duarte.　He saw Duarte give Love money in a cereal box.　Love came into the house and "asked if anyone wanted cereal."[29]　After Love counted the money, he called Duarte and said "you're $500 short, I need that money."　Bowens and Fitts were present.

Davis testified that he and Love went to the bank and got a cashier's check.[30]　He and Love drove to Harriman the next day, picked up Love's mother, and drove to Atlanta where Love bought the Cadillac Escalade.

Although Davis had no felony drug conviction at the time of trial, he has since been convicted of a conspiracy to distribute more than 100 kilograms of marijuana in the Knoxville

---

[29]　Davis does not say in his affidavit that he witnessed the exchange of money, that it was in a cereal box or that he heard Love ask if anyone wanted cereal.　The claim about what Love said is not reported by any other witness.

[30]　As noted above, this is consistent with Love's testimony but inconsistent with that of Bowens.

division of this Court.[31] He testified that he had been interviewed by Jessee and Street by telephone.

(7) <u>Quinlan Fitts</u>, friend of Love and roommate of Bowens. Fitts has been a friend of Love since they met in 1998 while in college. He was also involved with Love in ReelTime Promotions.

On one occasion, Fitts saw Duarte, whom he had met but didn't know, come by 513 Hart Avenue. Love and Duarte went to the dining room table where he saw them counting a large sum of money. Love later said Duarte was investing in the Knoxville concert.

Fitts was also present when Duarte came by to purchase the Navigator and gave Love a large sum of cash in a cereal box. After Love counted the money, he said it was $500 short. Love called Duarte and Duarte returned with the $500. Fitts also came home one day to find a champagne colored Escalade in the driveway. Love said he was selling it to a Mexican. Once again, Duarte brought Love a large sum of money in a cereal box. Fitts' affidavit said Bowens and Davis were present at the time. Fitts was interviewed by Love's attorneys and was present at the courthouse during the trial.

Love makes two claims of ineffective assistance of counsel related to these witnesses, the first of which is an absolute none-starter. First, he claims deficient performance because Street and Jessee did not interview and investigate witnesses with knowledge of Love's involvement. It is clearly established that counsel has a duty to "make reasonable investigation," *Strickland v. Washington*, 466 U.S. 668, 691 (1984), and is obligated to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258

---

[31] The indictment in that case, No. 3:09-CR-40, charged Davis with a conspiracy beginning about July, 2008 and continuing until about February, 2009. Davis was sentenced to 24 months of imprisonment. Although the conviction occurred after Love's trial, it certainly could be used to impeach Davis if there were a retrial.

(6th Cir. 2005).

Love's problem here is that the testimony at the March 9 hearing established quite convincingly that counsel did in fact investigate and interview these witnesses. Both Street and Jessee testified that they took Love's list and spent considerable time locating and interviewing the witnesses. Street and Jessee are fully credited on this issue. Jessee, who remained in the courtroom for the testimony of all witnesses, testified that, even though he no longer has his file nor any notes of interviews, he was generally familiar with the testimony given by the witnesses.[32] In addition, most, if not all, of the witnesses acknowledged having been interviewed by Jessee and/or Street, some on multiple occasions. Love simply cannot establish here that counsel failed to investigate or interview witnesses with relevant and pertinent information about the case.

The more significant issue here is whether counsel were deficient by failing to call some or all of the witnesses identified by Love in his motion.[33] The merits of the claim are examined in light of the familiar two-prong test set forth in *Strickland*. The first prong requires petitioner to prove that trial counsel's representation was deficient in that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. as 698. The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances, the challenged conduct

---

[32] Jessee did state that he wasn't sure he remembered talking to Quinlan Fitts and Antwane Davis; however, Fitts testified that he did in fact talk to counsel. Jessee also acknowledged that neither he nor Street interviewed Delman Davis. There is nothing here to suggest that Davis' attorney would have allowed Davis to be interviewed, at least not before Davis rested his case at trial. In fact, the contrary is true.

[33] Other than the witnesses noted above, Love identifies several witnesses who did not testify at the evidentiary hearing. Since their affidavits were not sworn to, the Court has disregarded those affidavits and will not consider any claim related to those witnesses because Love has not been able to show what the nature of their anticipated testimony would have been or that they were willing to testify at trial. In fact, one of those witnesses, Christy Lee, was subpoenaed by Love but did not appear at the March 9 hearing.

22

might be considered sound trial strategy." *Id*. at 689. The second prong requires Love to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

In addition, decisions about whether to call particular witnesses at trial are generally matters of trial strategy and, absent a showing of prejudice, the failure to call a witness does not deprive a defendant of effective assistance of counsel. Judge Batchelder summarized the applicable legal principles in her dissent in a recent Sixth Circuit opinion:

> The decision to call or not call certain witnesses is exactly the type of strategic decision that the courts expect attorneys to make. *See United States v. Best*, 426 F.3d 937, 945 (7th Cir.2005) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to present each and every witness that is suggested to him." (citations and internal quotations omitted)); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."); *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir.1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel."); *Tosh v. Lockhart*, 879 F.2d 412, 414 (8th Cir.1989) ("[T]he decision not to use alibi testimony may reflect the reasonable exercise of judgment in view of the attorney's concern that the testimony would be conflicting ... or otherwise unfavorable." (internal citations omitted)); *cf. Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (citation omitted)).

*Boykin v. Webb*, 541 F.3d 638, 649 (6th Cir. 2008) Batchelder, J., dissenting. Furthermore, "[a] defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

23

At the March 9 hearing, Jessee and Street outlined the general nature of their trial strategy, and the Court is loathe to second guess the trial strategy of very experienced criminal defense attorneys. Not only that, the strategy was a completely reasonable one under the circumstances. The strategy was simple – stay away from witnesses with prior drug convictions or participation in drug trafficking, attack the credibility of Serna and Duarte, avoid testimony about Love meeting with people, especially drug dealers, away from home, the exchange of large sums of cash, especially cash in cereal boxes, and call the defendant, an intelligent, articulate witness, to counter the testimony of Duarte and Serna, supporting Love's testimony where possible with documentary evidence. The strategy including avoiding talk of the drug ledgers as much as possible. Both Jessee and Street felt the strategy had worked well when they made the decision, after consulting with Love, to call no further witnesses in the case. They had vigorously attacked the credibility of Serna and Duarte, Love had done an excellent job testifying and, although there were some minor "bumps" on cross-examination, he had been largely unimpeached.[34] They had been able to support parts of Love's testimony with documentary evidence such as promotional brochures for the concert promotion company, loan documents related to the vehicle transactions, tax returns for the business and the like. Bowens and Browne had been called for a limited purpose of plugging some very small holes in the case.

All of this supports the legitimate concern of counsel that calling additional witnesses, even those potentially helpful on some subjects, simply exposed the defendant to the unacceptable risk

---

[34] The Court, having presided over the trial, certainly concurs with counsel's assessment. Love was one of the most articulate and convincing defendants the Court has seen. He was well spoken and poised on the witness stand and he largely avoided most of the pitfalls generally associated with defendants testifying in their own behalf.

of inconsistencies in testimony or a major misstep by one of the witnesses.[35]  Maybe most importantly, the attorneys consulted with Love before resting their case and he concurred, as he had in other matters of strategy.  Other than by viewing the strategy in hindsight in the context of the result, the strategy is sound and reasonable.  Love cannot establish that these strategic decisions by experienced, capable counsel were deficient.

Finally, even if Love could establish deficient performance, he cannot show a reasonable probability that the result of his trial would have been any different.  First of all, none of the testimony was exculpatory.  Some of it was, at best, of some impeachment value.  While some of it bolstered Love's testimony, much of it also undercut his defense theories, especially the testimony of Davis that he witnessed Love exchange his business phone number, the one found in the drug ledger, with Duarte, and that of Susan Jordan concerning her use of the name "Travis."  The inconsistencies in the witnesses testimony [36] and the testimony about exchange of large sums of cash, off the books investments in the promotional company, cash bundles in cereal boxes, and the like,  would clearly not have been helpful to the defendant, and would likely have undercut his own credibility on some major issues.  Under these circumstances, petitioner simply cannot show a probability that the outcome of his trial would have been any different.

II.    **Conclusion**

For all of these reasons, and for the reasons set out in the Court's prior memorandum and order dated February 9, 2012, [Doc. 888], and the Court's memorandum and order dated March 14, 2012, [Doc. 904], the petitioner's motion to vacate pursuant to § 2255 will be DENIED and

---

[35]  This, of course, is exactly what happened at the March 9 hearing.

[36]  The Court has highlighted some of those inconsistencies throughout the body of this opinion; however, the Court has not attempted to identify every inconsistency in the witnesses' testimony.

his motion DISMISSED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F. 3d 466 (6th Cir. 2001). The District Court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standard set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000). *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The Court believes that its decision with respect to all issues except Love's claim of ineffective assistance of counsel related to counsel's failure to call certain witnesses is not debatable and a certificate of appealability will be DENIED as to each of those claims. The Court will, however, grant petitioner a certificate of appealability as to the question as of whether or not counsel's decisions not to call certain witnesses at trial constitutes ineffective assistance of counsel, but not as to any other issue.

A separate order will enter.

ENTER:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE